# PATRICK J. SEXTON

## v.

# MORRIS T. MARTIN ET AL.

*Creditors' Bills—Services of Insolvent — Lien—Practice — Gaming — Husband and Wife.*

1.  The creditors of an insolvent have no claim upon his services, and he may give them away by working gratuitously for another.

2.  A court will not, through a receiver, operate or sell gambling tools, and will not disturb any disposition (other than in trust for himself) that the owner may make in advance of what may accrue from the use of such tools.

3.  This court affirms a decree dismissing a bill seeking to subject certain real estate of a married woman to sale under execution against her husband.

[Opinion filed January 16, 1891.]

APPEAL from the Superior Court of Cook County; the Hon. EGBERT JAMIESON, Judge, presiding.

Messrs. A. S. BRADLEY and E. J. PHILLIPS, for appellant.

A court of equity should hold that the lands purchased with the proceeds of the Phœnix Grain and Stock Exchange business are not Mrs. Martin's separate and individual property, as against her husband's creditors.

"Purchases of property by the wife of an insolvent debtor during coverture are justly regarded with suspicion, unless it clearly appears that the consideration was paid out of her separate estate," and a *bona fide* and real consideration. Waite, Fraud. Conv., Sec. 308; Bay v. Cook, 31 Ill. 345–6.

The issuing of the stock was, in substance and effect, a voluntary conveyance from Martin to his wife. It certainly was not derived, in good faith, from a source other than her husband. Reeves v. Webster, 71 Ill. 309; Hall v. Sroufe, 52 Ill. 422.

In Illinois a husband may act as agent for his wife in a particular transaction, or agent for the control of her property, or the investment of her funds if acquired *bona fide* from

another source, without subjecting her property to his debts, but she can not make him her agent to engage in trade or business to be managed by him, to which all his time and energies must be devoted, without subjecting the property embarked in such trade and its profits to the payment of his debts. Wortman v. Price, 47 Ill. 22; Wilson v. Loomis, 55 Ill. 352; Robinson v. Brems, 90 Ill. 351; Patton v. Gates, 67 Ill. 164.

Mr. L. H. Bisbee, for appellees.

Gary, J. This is a bill filed by the appellant, a judgment creditor of the appellee Morris T. Martin.

The object of it is to subject real estate, the title to which is in the appellee Carrie Martin, wife of Morris, to sale under execution against him.

This record is very short, as a large part of the appellant's evidence was ruled out, and the appellees put in none. It does, however, appear from the evidence introduced and that offered and rejected, as it is stated in the brief of the appellant, which it is not unfair to him to assume to be true, that on the 18th of December, 1883, Morris T. Martin, with Charles L. Campbell, obtained letters patent upon a machine, which the brief calls the "notorious clock used so successfully in gambling on market prices of stocks, grain, etc."

By the use of the word "notorious" the appellant doubtless intends that we shall bring to this case that knowledge, which, in common with readers of Chicago newspapers, we have of "Skakel's clock," which has been, though the name is not mentioned in the report, the subject of litigation in this court. N. Y. & C. G. & S. Ex. v. Mellen, 27 Ill. App. 555.

In September, 1883, a corporation was organized, with a nominal capital of $300,000, of which it may be Morris T. Martin had one share of $50, and his wife had 3,000 shares, for which she paid $500 in money that she borrowed on her own note from William Skakel. Skakel and Campbell also put some money—how much does not appear—into the company, but Morris T. Martin did not. He was then insolvent. He was, however, one of the three persons who joined in the

statement required by Sec. 2, Chap. 32, R. S. 1872, of those who propose to form a corporation.

The object of the corporation was to buy and sell stock, grain and provisions on commission, as the statement affirmed; in fact it was to fleece the lambs, as described in the report in 27 Ill. App.

Morris T. Martin was then about forty-five years old ; had been in what he calls the " wholesale whisky business " six or seven years; failed in it; the residue of this life as a man, interested in gambling.   He managed the business of the company; the clock was used in it, and the company paid him $30 per week.   She gave no attention to the business, and indeed, was not capable of so doing.   It is a fair construction to put upon the evidence, that whatever he advised her to do, she did without question ; but the evidence does not show that such advice was intended or understood as a command.   She was a free woman, enjoying the liberty conferred upon wives by the statutes of Illinois.

The company made large profits; she received, herself, from the company, large dividends; paid Skakel; invested in real estate in her own name.   In all these acts of hers it does not appear that her husband took any part, even by way of advice.

In whatever it was necessary that she should do as a stockholder of the company, her husband was her proxy.   She finally sold her stock for, perhaps, $10,000.   In that sale her lawyer acted for her; she left it to her husband as her agent, and to her lawyer.   Since then the family, husband, wife and one child, have continued to reside upon property she thus bought.   He managed one or more farms, the title to which is in her name.   There is no agreement between them; simply talked about how they could get along, and that he should be manager.   When he needs any money she gives it to him, but he has no salary set.   The answers were called for under oath, and deny that he has any interest in the property held in her name.

It would be mere juggling with words to deny that the property she holds is in effect the result of his audacity, exer-

tions and luck in an unlawful pursuit; yet there is nothing in the case to show that $30 per week is not a full compensation for the services of a man past middle age without trade, profession, education or experience in successful lawful business. The case raises the question whether, in equity, creditors have, upon the future of their debtors, such a *quasi* lien, that while they can not compel them to labor to pay their debts, yet if they do successfully labor for a home and future support of a wife with her child, the proceeds of that labor shall be taken from her, though he never, for an instant, had them in his possession, or the right as between themselves to control them, however pliant, it may be conjectured, she would be to his wishes.    The cases under the law of 1861 are not now authority upon that question.    Before the real estate in question was bought the price was in her possession as money; when thus in her possession the money, under that law, unless she acquired it from some person " other than her husband," was his.

Under that law he could make no valid arrangement with her in advance, that money that he should earn should be earned on her account, as he would still be the source of the money.

But could he not have made such arrangement with anybody except his wife, upon any or no consideration, and would not the only question have been whether the arrangement was in fact what it was in form, and not a cover for a secret trust for him?    The answers here deny such a trust, and there is no evidence of it, except inferences from their marital relation, and the absence of any agreement between them. Does the law compel them to have any agreement?

If the creditors have no lien, or anything in the nature of a lien, upon his person, how can they object that he works gratuitously, serves in name, while in fact, by advice which she is free to reject, he directs his wife, taking without her dissent from day to day what he chooses, and yet in the event of dissension between them, he is liable to be turned out of doors without warning?

The Appellate Court of the Second District has twice de-

Sexton v. Martin.

cided this question contrary to our view of the law. Guill v. Haney, 1 Ill. App. 490; Card v. Robinson, 2 Ill. App. 19.

But that court does not discuss the question which, it seems to us, lies at the foundation of the case of the appellant, viz.: Have creditors any claim upon the future of their debtor? The cases in the Supreme Court, cited by that Appellate Court, were all under the law of 1861.

For myself, I see no escape from the concise logic of Earl, C., in Abbey v. Deyo, 44 N. Y. 343–8: "The creditors of an insolvent have no claim upon his services. They can not compel him to work and earn wages for their benefit, and hence he does not defraud them if he chooses to give away his services by working gratuitously for another." And whether that gratuitous labor is in a lawful or unlawful business, to which the wife has contributed nothing, or a substantial capital, does not affect the legitimacy of the conclusion from the premise. If as between themselves the proceeds of this gambling business, before anything had accrued, belonged to the wife and not to the husband, and if the property in which the proceeds were invested stands in the same situation, his creditors are not defrauded, even if the affection and pliancy of the wife does make his condition in life easier than it would be if she were to put him out into the world. King v. Voos, 4 Oregon, 91; Cooper v. Ham, 49 Ind. 393; Miller v. Peck, 18 W. Va. 75.

As to the use of the clock, whether the $30 per week to Martin was for his services and the service of the clock or not, a court would not, through a receiver, operate or sell gambling tools, and therefore can not disturb any disposition (other than in trust for himself) that the owner may make in advance of what may accrue from the use of such tools.

They are not assets which the law will convert into money; to sell them would be to give legal sanction to unlawful pursuits. It may be conceded that it is not probable that if Morris T. Martin had not been in debt, that such arrangements about the stock of the corporation, the dividends and their investment, would have been made as she now claims; but the fact that he was in debt, was a good and sufficient

reason why just such arrangements should be made, that thereby this wife and mother should have support for herself and child, and if she chose so to do, support her insolvent husband also. The source from which the funds came, creditors had no claim upon.

It is true, that if those funds had accrued to him from that source, his creditors could reach them, but if they did not accrue to him, they have no claim upon them. The majority of the court concur in this opinion, and the decree dismissing the bill is therefore affirmed.

*Decree affirmed.*