# JOHN WILSON *et al.* impleaded, etc.

*v.*

# JOHN LOOMIS *et al.*

1.  HUSBAND AND WIFE—*property of the latter under law of* 1861. Notwithstanding the act of 1861, if a married woman advance her own separate money and place the same in the hands of her husband for the purpose of carrying on any general trade, although in the wife's name, and the husband by his labor and skill in that undertaking increase the funds, the entire capital embarked in the enterprise, together with the increase, will not constitute the separate estate of the wife, but will be liable for the debts of the husband.

2.  Though as between the husband and wife, if the rights of no creditors intervene, the rule might be different.

WRIT OF ERROR to the Circuit Court of Kane county; the Hon. SILVANUS WILCOX, Judge, presiding.

The opinion states the case.

Mr. CHARLES J. METZNER, for the plaintiffs in error.

Mr. EUGENE CANFIELD, for the defendants in error.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

The defendants in error claim to have purchased the property in question from Mrs. Rosette Roe. At the time they purchased the property there was an execution in the hands of the sheriff, issued on a valid judgment, in favor of Jonathan Abel and against Cornwell S. Roe. Soon after the property came into the possession of the defendants, it was seized and taken out of their possession by the deputy sheriff, one of the plaintiffs in error, by virtue of the said execution, and thereupon the defendants in error instituted this suit to recover the possession of the property.

The principal question involved in this case is, whether a married woman, under the act of 1861, can engage in general trade, with her husband as the managing agent, contributing his time, skill and labor to the management of the business, without making the capital embarked in the enterprise and the proceeds thereof liable to the husband's debts.

The theory advanced by the defendants in error is, that with money realized from the policy on the life of James E. Roe, whose life was insured for her benefit, Mrs. Roe purchased a stock of lumber at the administrator's sale of the effects of James E. Roe, deceased, and, together with money realized from the sale, she formed a partnership with one Howell, for the transaction of a general business in the lumber trade, and in all such articles as properly belong to that branch of business. By the terms of the written contract, Mrs. Roe and Howell were to be equal partners, the business to be conducted in the name of Roe & Howell, and Cornwell S. Roe, the husband, was to give his personal attention to the business of the firm without charge to the firm. The business was conducted in the firm name of Roe & Howell, and was continued through a series of years and was quite profitable. It is in evidence that during all the time of the existence of the firm, C. S. Roe gave the business his personal attention ; what compensation, if any, he received for his services, the evidence does not disclose.

After the firm of Roe & Howell was dissolved, and Howell retired, the business was continued for a short time in the name of " C. S. Roe, Agent." The property now in controversy seems to have been the remnant of the lumber left from the business of Roe & Howell. The stock originally put into the firm was all sold long before this controversy arose, except perhaps a small office building and some little furniture now in dispute. The property was sold to the defendants in error for a valuable consideration, and soon after it went into their possession, it was levied on under the execution issued on the judgment against Cornwell S. Roe.

The business of the firm of Roe & Howell, so far as Mrs. Roe's interests were concerned, was attended to and conducted solely by her husband. She never gave it any personal attention. He was diligent and constant in his attention to the business, and so far as the public could know, it was his business, except that it was conducted in the name of the wife. The fact that the wife was the partner seems to have been generally known. The trade must have been very profitable, for, on the dissolution of the firm of Roe & Howell, there was found to be due Mrs. Roe, as her share of the proceeds of the business, some $6000 to $8000. In addition to this, the family must have used the means received from the business for their maintenance, as it does not appear from the evidence that they had any other source of income.

If it be conceded that the money that constituted the capital at the beginning of the trade was the separate estate of Mrs. Roe, would that fact entitle her to appropriate to herself, as separate estate, the fruits of her husband's labors through a series of years, in a trade, which, by his skill and industry, he had rendered most profitable, to the exclusion of his creditors? If she could thus appropriate the results of the husband's labor, industry and skill, to herself, as separate estate, for a number of years, no reason is perceived why she could not do it for an entire life time. In the event that the wife had sufficient separate estate with which to engage in the business of a general trade, she might be able to conduct it from year to year, until, by the labor and skill of the husband they would amass a fortune, and if the proceeds of that trade belonged exclusively to the wife, as her separate estate, the creditors of the husband would be without remedy. It was certainly never contemplated by the legislature that any such results would follow from the act of 1861. A man's labor and skill in any trade or branch of business is most valuable capital, and it is as unlawful for him to appropriate the results of that labor and skill to the exclusive use of the wife, as her separate property,

as it would be to thus appropriate his money to the detriment of his creditors. It is a man's first duty to provide a sufficient support for his wife and family, and when that is accomplished he has no legal or moral right to divert the surplus earnings arising from his skill and labor to any other purpose than the payment of his just debts, if he owes any. It is manifest in this case that the lumber trade in which the firm of Roe & Howell was engaged, was rendered profitable by the skill and labor of the husband, and the increase from that labor and skill bestowed in the conduct of the business, lawfully belonged to him and not the wife. If there were no creditors whose rights would be affected, of course he could work for whomsoever he pleased, and give any direction he chose to the results of that labor. It is seldom, however, that we find men working exclusively for and carrying on the business of a general trade in the name of the wife, when there are no debts, the payment of which it is desirable to avoid. The rule is, that if the wife advance her own separate money, and place the same in the hands of her husband for the purpose of carrying on any general trade, and the husband, by his labor and skill in that undertaking, increase the funds, the entire capital embarked in the enterprise, together with the increase, will not constitute the separate estate of the wife, but will be liable for the debts of the husband. As between the husband and wife, if the rights of no creditors intervene, the rule might be different.

Cases of a kindred character have frequently been before this court, and in all of them a uniform construction has been given to the statute of 1861 in relation to the separate property of married women. It was, no doubt, the intention of the legislature, that that act should have a liberal construction, but it must not be so construed as to permit unworthy men under its cover to perpetrate gross frauds on the rights of their creditors. For all legitimate purposes it has been construed liberally, for the protection of the just rights of married

356     WILSON *et al. v.* LOOMIS *et al.*     [Sept. T.,

Opinion of the Court.

women, in the use and enjoyment of their separate estate. Farther than this we are unwilling to extend its meaning.

The first case bearing directly on this question, in which the statute of 1861 received a construction, is *Brownell* v. *Dixon*, 37 Ill. 198. In that case, Mrs. Gray, with certain notes, alleged to have been given to her by her brother-in-law, purchased a billiard saloon and furniture, and placed her husband in the use and control of it. The billiard tables were subsequently levied upon under an execution, issued on a judgment against the husband. It was held, that the property was liable to the execution, and that in equity and in justice the profits of the saloon belonged to the husband, and were liable for his debts.

The case of *Wortman* v. *Price*, 47 Ill. 22, is in some respects similar to the present one. It was claimed that Mrs. Price furnished the money out of her separate funds with which to engage in the business of buying and selling stock, in partnership with one Johnson, and that her husband was to, and did, attend to the business for her. The property so purchased with the funds of the wife was levied on under an execution issued on a judgment against the husband, and it was held to be liable for his debts. In commenting upon the case of *Brownell* v. *Dixon, supra,* the court say : "We did not say, nor expect to be understood as saying, that she could make him her agent for the purpose of engaging in trade to be managed by him, and to which all his time and energy might be devoted, and that the property embarked in such trade and its profits would be beyond the reach of his creditors. Such is not the law."

In *Elijah* v. *Taylor*, 37 Ill. 249, it was held that if the husband, by his personal labor, raise a crop upon the lands of his wife, it would be liable for his debts.

The case of *Dean* v. *Bailey*, 50 Ill. 481, is in entire harmony with the views here expressed, and the rule laid down in *Wortman* v. *Price, supra,* was adhered to.

If it be conceded that the money originally invested in the lumber business was the separate estate of Mrs. Roe, it must, nevertheless, from the rule in *Wortman* v. *Price,* be regarded as loaned to the husband. The capital originally invested in the trade was increased by the labor of the husband, and then reinvested, and so on until it had increased three or four fold, and the property thus acquired by the labor and energy of the husband must be held liable for his debts. A married woman cannot engage in a general trade or business, with her husband as the managing agent, to which he must devote his whole time and energy, and yet all his earnings be beyond the reach of his creditors. This would be a perversion of the principles of the law of 1861, from the beneficent purposes designed by the legislature in its enactment.

The views here expressed will dispose of all the objections taken to the giving and refusing of instructions at the trial, and on another trial the court will make the instructions conform to the principles announced in this opinion.

For the reasons indicated, the judgment in the circuit court will be reversed and the cause remanded.

*Judgment reversed.*